JS 44 (Rev. 12/12)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JACK EDWARDS, individually and on behalf of all others similarly situated
1158 Kingfisher Circle
Folson, CA 95630

**DEFENDANTS**

MATTHEW GOLDFARB, et al
c/o Pep Boys
3111 W. Allegheny Avenue
Philadelphia, PA

**(b)** County of Residence of First Listed Plaintiff   Sacramento County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Brodsky & Smith, LLC
Evan J. Smith, Esquire
Two Bala Plaza, Suite 510
Bala Cynwyd, PA  19004
610-667-6200

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| | | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
§ 14(e) and § 20(a) of the Securities and Exchange Act

Brief description of cause:
Violation of securities laws regarding material omissions in Tender Offer Documents

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

NOV 24 2015

DATE   11-24-15

SIGNATURE OF ATTORNEY OF RECORD   S.T.

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____



6304

## UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: _1158 Kingfisher Circle, Folsom, CA 95630_

Address of Defendant: _C/o Pep Boys, 3111 W. Allegheny Ave., Phila., PA_

Place of Accident, Incident or Transaction: _Philadelphia, PA_

(Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))     Yes☐  No☑

Does this case involve multidistrict litigation possibilities?     Yes☐  No☑

RELATED CASE, IF ANY:

Case Number: _____  Judge _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐  No☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐  No☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐  No☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐  No☑

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A.  Federal Question Cases:
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B.  Diversity Jurisdiction Cases:
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

### ARBITRATION CERTIFICATION
(Check Appropriate Category)

I, _Evan J. Smith_, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☑ Relief other than monetary damages is sought.

DATE: _11-24-15_     _____     _PA 79032_
                      Attorney-at-Law         Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

NOV 24 2015

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _11-24-15_     _____     _PA 79032_
                      Attorney-at-Law         Attorney I.D.#

CIV. 609 (5/2012)



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

### CASE MANAGEMENT TRACK DESIGNATION FORM

Jack Edwards, individually and on behalf of all
others similarly situated

v.

Matthew Goldfarb, et al.

**CIVIL ACTION**

**NO.** 15        6304

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                     ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                            ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                     ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.) breach of fiduciary duty + complex legal issues pertaining to injunctive relief (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks. under securities ( )
    laws

_____11-24-15_____        _____        _____Evan Smith_____
**Date**                     **Attorney-at-law**       **Attorney for** Jack Edwards

_____610-667-6200____        ____610-667-9029____        esmith@bidsky-smith.com
**Telephone**                **FAX Number**             **E-Mail Address**

(Civ. 660) 10/02

NOV 24 2015



$400

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JACK EDWARDS, individually and on behalf of all others similarly situated, ) ) ) | |
| Plaintiff, ) ) ) | Case No. 15   6304 |
| v. ) ) | |
| MATTHEW GOLDFARB, ROBERT H. HOTZ, JACK LIEBAU, JR., BRUCE M. LISMAN, JAMES A. MITAROTONDA, ROBERT ROSENBLATT, JANE SCACCETTI, ROBERT L. NARDELLI, SCOTT SIDER, JOHN T. SWEETWOOD, ANDREA M. WEISS, and THE PEP BOYS – MANNY, MOE & JACK, BRIDGESTONE RETAIL OPERATIONS, LLC, BRIDGESTONE AMERICAS, INC., AND TAJ ACQUISITION CO., ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL REQUESTED** |
| and ) ) | |
| THE PEP BOYS – MANNY, MOE & JACK, a Pennsylvania corporation, Nominal Defendant. ) ) | |

### SHAREHOLDER CLASS AND DERIVATIVE ACTION COMPLAINT

Plaintiff Jack Edwards ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

### NATURE OF THE ACTION

1.      As a shareholder of The Pep Boys – Manny, Moe & Jack ("Pep Boys" or the "Company"), Plaintiff brings this shareholder class on behalf of the public common shareholders of Pep Boys and derivative action on behalf of the Company, seeking equitable relief for the breach

of fiduciary duties by the Pep Boys Board of Directors (the "Board" or the "Individual Defendants") arising out of their ongoing efforts to sell the Company to Bridgestone Retail Operations, LLC ("Bridgestone Retail"), a subsidiary of Bridgestone Americas, Inc. ("Bridgestone Americas," together with Bridgestone Retail and TAJ Acquisition Co., "Bridgestone"), pursuant to an unfair price, an unfair process, and through a materially misleading recommendation statement. In addition, Plaintiff brings a claim individually on behalf of himself against Defendants for their violations of Section 14(e) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Headquartered in Philadelphia, Pennsylvania, Pep Boys is the nation's leading automotive aftermarket chain. The Company derives its revenues from two business segments: a retail business, which includes sale of automotive parts and accessories and tires, and a service business.

3.      On October 26, 2015, Pep Boys and Bridgestone announced that they had entered into an Agreement and Plan of Merger dated October 26, 2015 (the "Merger Agreement"), pursuant to which Bridgestone Retail, through its wholly-owned subsidiary TAJ Acquisition Co. ("TAJ"), will acquire all outstanding shares of Pep Boys common stock (the "Proposed Transaction" or "Merger") through a tender offer (the "Offer"). Pursuant to the terms of the Merger Agreement, for each share of Pep Boys common stock, shareholders will be entitled to receive $15.00 in cash. The total equity value of the Proposed Transaction is approximately $835 million. TAJ commenced the Offer on November 16, 2015 and, unless extended, is scheduled to expire on January 4, 2016.

4.      The Proposed Transaction is the product of a process impermissibly tainted with conflicts of interest. The Proposed Transaction is being driven by the Company's largest

shareholder, GAMCO Asset Management Inc. and its affiliates ("GAMCO"), along with activist shareholder and Pep Boys director James A. Mitarotonda ("Mitarotonda"), the co-founder, President, and CEO of Barington Capital Group LP. ("Barington Captial," collectively with its affiliates, "Barington"). GAMCO and its affiliates currently own approximately 19% of Pep Boys's outstanding common shares and its interests are represented by at least three members: Matthew Goldfarb ("Goldfarb"), F. Jack Liebau ("Liebau"), and Bruce M. Lisman ("Lisman"). GAMCO and Barington, and the directors on the Board representing their interests, have interests that conflict with the Company and its unaffiliated shareholders, including the goal of a liquidity event.

5.      In light of the activist shareholders' influence, the Board failed to protect the interests of unaffiliated stockholders and cannot be considered "well-functioning."

6.      While the Company has struggled recently with weak sales, in April 2015, the Company indicated that it was in a "time of transition" and that its "investments in the high-growth areas . . . increased revenue, but temporarily depressed margins." Even more recently, in September 2015, the Company indicated that its "biggest opportunity is to grow top-line revenue" and it was still "laying the groundwork to create a sales and service culture . . . to lead the way."

7.      Pep Boys is well-positioned for recovery and future growth. It is clear that, if given the opportunity, the Company would rebound. In fact, the Company's reported financial results for the quarters ended May 2, 2015 and August 1, 2015, reflect continued year-over-year improvements in sales and earnings and increased gross profit margins and controlling costs.

8.      Rather than focus on further bolstering stockholder value, the Board has capped it instead by capitulated to the demands of GAMCO and Barington and agreeing to the inadequate and opportunistic cash takeover by Bridgestone.

9.      Defendants acknowledge in Pep Boys' Schedule 14D-9 Recommendation Statement filed with the United States Securities and Exchange Commission ("SEC") on November 16, 2015 (the "Recommendation Statement") that, at the same time that the Board was considering the Proposed Transaction, the Company also received a competing stock-for-stock offer from a strategic buyer referred to as "Party A" that purportedly yielded an implied value of $15.78 per Pep Boys share based on the closing price of Party A's common stock on October 23, 2015. In accepting the Proposed Transaction with Bridgestone and ending further negotiations with Party A, the Board failed to act in the best interest of Pep Boys and its unaffiliated shareholders and was, instead, unduly influenced by GAMCO and Barington to accept the lower all-cash offer from Bridgestone.

10.     The Board agreed to an all-cash transaction with Bridgestone despite the potential for structuring the merger with Party A as a tax-free transaction and Party A's apparent willingness to negotiate and provide certain deal protections for the benefit of Pep Boys and its shareholders. For example, during negotiations Party A agreed to include, among other things, a collar provision that protected Pep Boys against downward fluctuations of Party A's stock price, a lower termination fee of $10 million in the event that Pep Boys failed to obtain shareholder approval and a termination fee of 3% of the Company's equity value in other circumstances, including in order to accept a topping offer, and a reverse termination fee that obligated Party A to pay $20 million to Pep Boys in the event that Party A failed to obtain shareholder approval for the transaction.

11.     In order to ensure the consummation of the Proposed Transaction, the Board, in breach of its fiduciary duties, has erected serious structural impediments that prevent the Company from receiving a topping offer. Among other things, the Merger Agreement includes a strict "No Solicitation" provision that prevents the Company from soliciting other potential acquirers or even

4

in continuing discussions and negotiations with potential acquirers, and that requires Pep Boys to enforce all confidentiality, "standstill," and similar agreements against all potential competing acquirers.

12.     The Recommendation Statement reflects that at least 9 parties (other than Bridgestone) have entered into non-disclosure ("NDA") and standstill agreements with Pep Boys, including Party A and a strategic buyer referred to as Party B, which had been in discussions with Pep Boys concerning its interest in acquiring the Company's retail business.     These NDA counterparties may be contractually prohibited from making a topping offer for the Company. While the "No Solicitation" provision of the Merger Agreement permits the Company to waive rights under these NDA and standstill agreements "to the extent necessary to enable such counterparty to make a Competing Proposal," it may do so only "if requested by the applicable counterparty." This limited exception is insufficient as it would not enable the Company to waive standstill agreements that contractually prohibit counterparties from contacting Pep Boys in order to request such a waiver. By contractually tying their hands to consider topping offers from the most likely bidders, the Board members have breached their fiduciary duties.

13.     Defendants have also attempted to inappropriately "lock-up" the sale of the Company through a provision in the Merger Agreement that that requires the Company to pay Bridgestone a termination fee of $35 million, which amounts to approximately 4.2% of the total equity value of the Proposed Transaction, in various circumstances, including in order to enter into a transaction with a competing bidder and in the event that Pep Boys does not obtain shareholder approval for the Proposed Transaction.     In contrast, the Merger Agreement does not require Bridgestone to pay any reverse termination fee to the Company in the event that Bridgestone materially breaches the Merger Agreement or fails to obtain regulatory approvals.

14. On November 16, 2015, the Company filed the Recommendation Statement with the SEC recommending that the Company's shareholders tender their shares in the Offer and accept the Proposed Transaction. The Recommendation Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information, thereby rendering the shareholders unable to make an informed decision as to whether to tender their shares in the Offer.

15. The Individual Defendants have breached their fiduciary duties of loyalty, due care, good faith, and candor by agreeing to the Proposed Transaction for inadequate and unfair consideration, and omitting material information from the Recommendation Statement, and Bridgestone has aided and abetted such breaches.

16. Accordingly, Plaintiff seeks to enjoin the Proposed Transaction or to rescind the Proposed Transaction in the event of its consummation unless and until Defendants cure their breaches of fiduciary duty and amend the Recommendation Statement so that it no longer omits material information concerning, among other things, the Proposed Transaction and the Board .

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Sections 14(e) and 20(a) of the Exchange Act. This Court further has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff is a citizen of California and no Defendant is a citizen of California.

18. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

6

19.     Venue is proper in this district because a substantial portion of the transactions and wrongs alleged herein occurred in this district. Furthermore, the Company is headquartered in this district.

## PARTIES

20.     Plaintiff is and has been at all relevant times, the owner of shares of Pep Boys' common stock. Plaintiff is a citizen of California.

21.     Pep Boys is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania. It maintains its principal corporate offices at 3111 W. Allegheny Ave., Philadelphia, Pennsylvania. Pep Boys is named as a defendant solely for the purpose of providing full and complete relief.

22.     Defendant Goldfarb has been a director of the Company since July 10, 2015 and is a GAMCO designee. Goldfarb is a citizen of Connecticut.

23.     Defendant Robert H. Hotz ("Hotz") has been a director of the Company since 2005, and has been the Chairman of the Board since 2011. Hotz is a citizen of New York.

24.     Defendant Liebau has been a director of the Company since July 10, 2015 and is a GAMCO designee. Liebau is a citizen of New York.

25.     Defendant Lisman has been a director of the Company since July 10, 2015 and is a GAMCO designee. Weiss is a citizen of Florida.

26.     Defendant Mitarotonda has been a director of the Company since 2006.  He is the co-founder, President, and CEO of Barington Capital. and the sole shareholder and director of LNA Capital Corp., which is the general partner of Barington Capital.  Mitarotonda is a citizen of New York.

7

27.     Defendant Robert L. Nardelli ("Nardelli") has been a director of the Company since March 2015. Nardelli is a citizen of Gerogia.

28.     Defendant Robert Rosenblatt ("Rosenblatt") has been a director of the Company since 2013. Rosenblatt is a citizen of New York.

29.     Defendant Jane Scaccetti ("Scaccetti") has been a director of the Company since 2002. Scaccetti is a citizen of Pennsylvania.

30.     Defendant Scott Sider ("Sider") has been the Company's CEO and a director since June 15, 2015. Sider is a citizen of Pennsylvania and/or Florida.

31.     Defendant John T. Sweetwood ("Sweetwood") has been a director of the Company since 2002, and served as the Interim Chief Executive Officer of the Company between September 2014, and June 2015. Sweetwood is a citizen of Georgia.

32.     Defendant Andrea M. Weiss ("Weiss") has been a director of the Company since 2013. Weiss is a citizen of Florida.

33.     Defendants Goldfarb, Hotz, Liebau, Lisman, Mitarotonda, Nardelli, Rosenblatt, Scaccetti, Sider, Sweetwood, and Weiss are collectively referred to as "Individual Defendants" and/or the "Board."

34.     Defendant Bridgestone Retail is a Delaware limited liability company and a wholly-owned subsidiary of Bridgestone Americas, Inc.  Its principal executive office is located at 333 E. Lake Street, Bloomingdale, Illinois 60108.

35.     Bridgestone Americas, Inc. is a Nevada corporation with its principal executive office located at 535 Marriott Drive, Nashville, Tennessee.

36.     Defendant TAJ is a Pennsylvania corporation and a wholly-owned subsidiary of Bridgestone Retail created for the purpose of the Proposed Transaction.

8

## SUBSTANTIVE ALLEGATIONS

### Company Background and Success

37.     Pep Boys is the nation's leading automotive aftermarket chain. Pep Boys has over

7,500 service bays in over 800 locations in 35 states and Puerto Rico. At these locations, Pep Boys

offers name-brand tires, automotive maintenance and repair, parts and expert advice, commercial

auto parts delivery, and fleet maintenance and repair.

38.     Pep Boys had a disappointing 2014 fiscal year ended January 31, 2015, with

Michael Odell resigning as the President, CEO, and a director of the Company in September 2014.

However, the Company began to rebound in 2015 as a result of certain initiatives taken by the

Company in the 2014 fourth quarter.

39.     In the Company's April 13, 2014 press release reporting its financial results for the

fourth quarter 2014 and fiscal year ended January 31, 2015, then-interim CEO Sweetwood

described as the fourth quarter as "a time of transition for the Company." During the 2014 fourth

quarter, the Company saw its sales increase by $6.7 million, or 1.3%, to $502.4 million from

$495.7 million for the quarter ended February 1, 2014. Sweetwood further commented:

> Our investments in the high-growth areas of our business – commercial, tires,
> fleet and digital – increased revenue, but temporarily depressed margins. . . .
>
> With only three weeks to go in the first quarter of 2015, *we are seeing a turn*
> *around in the business*. At this point comparable store sales are up with double
> digit-growth in commercial, fleet and digital. With margins recovering,
> combined with improved expense and inventory management, to date we are
> seeing an improvement in operating profit and cash flow.

(Emphasis added.)

40.     The Company reported much improved results for its first quarter 2015 ended May

2, 2015. As Pep Boys announced in its Form 10-Q filed with the SEC on June 10, 2015, Pep Boys

saw year-over-year sales increase by $3.4 million, or 0.6%, to $542.3 million from $538.8 million

9

for the 2014 first quarter; and, total revenues increase by 0.6%, or $3.4 million, compared to the

2014 first quarter. Importantly, the Company saw net earnings of $11.9 million after seeing a net

loss of $26.7 million in the 2014 fourth quarter.

41.     In the Company's June 8, 2015 press release, then-interim CEO Sweetwood

emphasized these positive results, stating:

> We are pleased to report the third consecutive quarter of positive comparable stores
> sales[.] . . . Once again, tires, commercial, fleet and digital led the way. More
> importantly, we improved our operating profit by 24% (excluding the discrete items
> discussed above) by maintaining our gross profit margins and reducing SG&A
> expense. . . . During the quarter, we also generated $10.0 million from the sale of a
> leasehold interest, a portion of which was reinvested into our next Road Ahead
> market – Baltimore – that is scheduled to be grand re-opened in July.

42.     In a June 9, 2015 conference call in connection with the Company's 2015 first

quarter results, Sweetwood stated:

> The fleet business has continued to grow at a double-digit rate, as our expanded
> sales force developed the business from segments, which we had previously not
> deeply penetrated. The new business is profitably selling bay occupancies and
> providing needed services to fleets of all sizes across our entire geography.
>
> Tires continue to be a success story for Pep Boys as both unit and dollar sales have
> been consistently growing. Consumers are responding well to the premium branded
> higher end products, now part of our assortment and the odds are better that we'll
> have the tires, they want, when they want them as we're moving more inventory
> from warehouses to the stores. The digital business is both growing sales and
> expanding margins. The range of products offered is continuing to grow and
> consumer input is guiding ongoing improvements to simplify navigation of our site
> to get DIY instructions, and better product information and to schedule service
> appointments. And each day more of our capabilities are mobile enabled.
> On the cost side, the revised labor management process implemented regionally
> last quarter has generated the planned savings. As it's rolled out nationally we
> expect to continue to see payroll costs fall and our in-store discount improvement
> program initiated in the fourth quarter of last year is now generating a 150 basis
> point reduction.
>
> Inventory continues to shrink. Our new replenishment system is putting the right
> product in the right stores at the right time and what isn't turning fast enough is
> being rationalized. We've also been successful with clearance sections in the stores
> to free up funds that would otherwise be tied up in inventory. For the future,

capitalizing on our recent success, we're creating new tire hubs within major markets, which will meaningfully increase the speed of delivery to stores. We're simplifying store operations by significantly reducing tasks to generate lower payroll costs and provide associates more time to spend with customers.

We're opening more service and tire centers during the year, continuously refining the model for better returns. And finally, two new Road Ahead markets grand re-open, Denver and Cincinnati, and a reduced investment model will be opening in Baltimore in July.

So in summary, sales grew, expenses fell, margins recovered and inventory decreased and we're adding productive new stores. I'd like to personally thank the 18,000 plus associates of Pep Boys for making all of this happen. Thank you very much.

43.     The news of Pep Boys' first quarter 2015 drove its stock price up as much as 19% from its June 8, 2015 closing price of $10.57 per share through June 29, 2015, the day before the Company announced its strategic review process. Indeed, the June 30, 2015 announcement had little, if any, effect on the Company's stock price.

44.     Pep Boys maintained its momentum in the 2015 second quarter ended August 1, 2015, hiring a permanent CEO – Sider. In addition, as Pep Boys announced in its Form 10-Q filed with the SEC on September 10, 2015, Pep Boys saw sales increase by $0.8 million, or 0.1%, to $526.5 million from $525.8 million for the thirteen weeks ended August 2, 2014; comparable sales increase by 0.3% compared to the 2014 second quarter; and, total revenues increase by 0.1%, or $0.8 million, compared to the 2014 second quarter. Pep Boys continued its positive earnings steak, seeing net earnings for the 2015 second quarter of $4.8 million as compared to a net loss of $0.3 million in the 2014 second quarter.

45.     In the Company's September 8, 2015 press release, CEO Sider touted these positive results, stating:

We continue to improve our operating profit by increasing gross profit margins and controlling costs[.] . . . And while we are pleased to report the fourth consecutive quarter of positive comparable store sales, I believe our biggest opportunity is to

11

grow top-line revenue. . . . *We are laying the groundwork* to create a sales and service culture focused on maximizing the value of each transaction and building customer loyalty. We expect service including tires, commercial and digital sales to lead the way.

(Emphasis added.)

46.     In a conference call concerning the Company's second quarter 2015 results held on September 8, 2015, Sider emphasized that the Company expected to continue to perform well, stating:

Our most significant opportunity is topline revenue growth. We are laying the foundation to create a sales and services culture, focused on maximizing the value of each transaction and building customer loyalty. We expect service, including commercial, tires, equipment, fleet, partnerships and digital sales to lead the way.

47.     As reflected in the Company's most recent recent financial results, and concurrent press releases and statements showing the Company's continual rebound, Pep Boys has made significant growth, and is expected to continue to yield returns for the Company and its shareholders well into the future.

48.     In light of the Company's recent strong performance, prior to the announcement of the Proposed Transaction, prior to the announcement of the Proposed Transaction, Pep Boys' stock price soared since the beginning of 2015, as evidenced by the *Yahoo! Finance* chart below:



**The Proposed Transaction Is the Product of a Process Tainted with Conflicts of Interest**

49.     The Proposed Transaction is the product of a flawed process tainted with impermissible conflicts of interest.  Despite receiving a competitive stock-for-stock proposal from strategic buyer Party A, as well as offers and expressions of interest from a number of other entities, the Board approved the all-cash transaction with Bridgestone on October 26, 2015.

50.     In late 2013, before GAMCO filed its Schedule 13D in January 2015 indicating its intent to wage a proxy contest and the addition of GAMCO's slate of directors on the Board, the Company had commissioned a feasibility study from a financial advisor referred to in the Recommendation Statement as "Financial Advisor A."   On March 5, 2014, Financial Advisor A delivered the feasibility study, which determined that a sale of the Company's retail business could be financially viable from both the Company's and a potential purchaser's perspective.

51.     Following discussions with Financial Advisor A concerning the feasibility study, the Board directed Financial Advisor A to contact a potential strategic purchaser of the Company's retail business, referred to in the Recommendation Statement as "Party B."

52.     Also in early 2014, Party A contacted the Company to request due diligence information as a prelude to submitting a nonbinding indication of interest for the purchase of the Company.   In March 2014, Party A provided its preliminary view that, based on public information, it would seek to acquire the Company in a cash-and-stock merger for $15 to $16 per share.

53.     Between October 2013 and October 2015, the Company entered into non-disclosure ("NDA") and/or standstill agreements with at least ten potential buyers, including Bridgestone, Party A, Party B, and a financial buyer referred to in the Recommendation Statement

13

as "Party F." Throughout 2014 and 2015, these potential buyers expressed interest in acquiring the Company, or a portion thereof, and submitted proposals and revised proposals to the Company.

54.     On January 28, 2015, GAMCO and its affiliates, led by activist shareholder Mario Gabelli, filed an amended Schedule 13D, disclosing its intention to initiate a proxy contest and that it had an increased its ownership stake in the Company to approximately 17.6%.  GAMCO had first disclosed its ownership stake in the Company in June 2012.

55.     The Company entered into an understanding regarding a settlement with GAMCO with respect to GAMCO's proxy contest on June 10, 2015.  Pursuant to that agreement, Pep Boys recommended GAMCO's slate of three director nominees – Goldfarb, Liebau, and Lisman – for election to the Board. On July 10, 2015, all three GAMCO nominees were elected to the Board. At this point, the priority of the Board shifted from acting in the best interests of shareholders to seeking a liquidity event to enable GAMCO to divest its large ownership stake in the Company.

56.     On October 12, 2015, the Company received "final" proposals from Bridgestone, Party A, and Party F. Bridgestone proposed an all-cash tender offer at a purchase price of $15.00 per share.  Party A proposed an all-stock transaction with a fixed exchange ratio, which based on Party A's closing stock price on October 9, 2015, yielded an implied value per share of $14.74. Party F proposed an all-cash one-step merger transaction at a purchase price of $15.00 per share, subject to certain financing contingents, including its ability to reach agreement with Party B regarding the terms of a sale of the retail assets.

57.     On October 14, 2015, at the direction of the Company, Rothschild contacted the financial advisor to Party A and requested, among other things, that Party A improve the exchange ratio and implied value of its offer, consider a fixed value structure subject to a collar that adjusted the number of Party A shares to be received after a certain percentage increase or decline in the

price of Party A stock above or below an agreed upon reference price, and substituting cash for stock to a level sufficient to remove the need for Party A to obtain shareholder approval.

58.     On October 16, 2015, the Company discontinued negotiations with Party F when they could not reach an agreement with respect to Party B's participation in Party F's acquisition proposal. Thereafter, on October 23, 2015, Party F continued to indicate in its interest in pursuing a transaction with the Company.

59.     On October 19, 2015, Party A delivered a revised proposal catering to the Company's request. Under the revised proposal Party A would issue shares of its stock for each Pep Boys share at a fixed *value* per share of $14.75 (rather than at a fixed exchange ratio), subject to a collar that would provide for fixed exchange ratios if certain conditions were met. Party A also exchanged its revisions to the draft merger agreement, wherein it proposed a bifurcated termination fee in which the Company would pay a lower fee in the event that Pep Boys did not obtain shareholder approval for the transaction.

60.     Party A improved its offer again on October 23, 2015. Among other things, Party A increased the fixed value per Share to $15.00, subject to a collar. Based on the closing price of Party A's common stock on October 23, 2015, which price was greater than the referenced price at the high end of the collar, the stock consideration issuable under Party A's proposal purportedly would have yielded an implied value per share of $15.56 without applying the trailing 15 trading day volume weighted average closing price required under the collar.

61.     In addition, Party A provided a revised draft of a merger agreement to Pep Boys, reflecting Party A's proposal of a $10 million termination fee payable to Party A in the event the Company's shareholders did not approve the transaction, a termination fee payable to Party A in other circumstances equal to 3.5% of the Company's equity value, and a $20 million reverse

termination fee payable to the Company in the event that Party A did not obtain shareholder approval.

62.     Also on October 23, 2015, Bridgestone delivered its final offer, which continued to provide Pep Boys with $15.00 per share.

63.     On October 24, 2015, Party A further improved its offer and proposed to reduce the reference price at the top end of the collar such that the amount of consideration payable per share would begin to increase pursuant to the agreed upon exchange ratio sooner than would otherwise be the case if such reference price remained the same. Based on the closing price of Party A's common stock on October 23, 2015, which price was greater than the reference price at the high end of the collar range, the stock consideration issuable under Party A's proposal would have yielded an implied value per share of $15.78 without applying without applying the trailing 15 trading day volume weighted average closing price required under the collar.

64.     On October 24, 2015, unlike Party A, Bridgestone indicated that it was unwilling to further improve its $15.00 per share offer and that it remained Bridgestone's best and final offer.

65.     On the evening of October 25, 2015, despite having received a higher stock-for-stock offer from Party A, unduly influenced by GAMCO and Barington's desire for a liquidity event, the Board elected to pursue the all-cash transaction with Bridgestone and requested that Rothschild render its opinion regarding the Bridgestone's offer.   After a presentation by Rothschild, the Board unanimously authorized Sider to execute the Merger Agreement.

66.     The parties Merger Agreement was executed on October 26, 2015, and a press release announcing its execution was issued the same day.

67.     On November 16, 2015, Bridgestone commenced the Offer.

68.     Given the Company's recent turnaround and Party A's apparent willingness to
provide more value for the Company, the Proposed Transaction consideration is inadequate and
significantly undervalues the Company.  Indeed, consummation of the Proposed Transaction will
sever the ownership interests of Plaintiff and other shareholders, ensuring that shareholders will
not be able to obtain future benefits of the Company's future growth.

69.     Moreover, the merger consideration fails to adequately compensate Pep Boys
shareholders for the significant synergies created by the Proposed Transaction for Bridgestone.
The Proposed Transaction is a strategic merger for Bridgestone because Pep Boys will add
approximately 800 locations to Bridgestone's nationwide network of 2,200 tire and automotive
service centers. Pep Boys and Bridgestone expect that the Proposed Transaction will cause an
immediate nationwide expansion of more than 35% for Bridgestone.

**The Interests of Pep Boys' Insiders Conflict With Plaintiff and Other Shareholders**

70.     The Proposed Transaction is being driven by the conflicting interests of the
Individual Defendants, particularly those affiliated with GAMCO and Barington, and Company
management who stand to receive lucrative special benefits from the Proposed Transaction.

71.     GAMCO, whose interests on the Board are represented on the Board by directors
Goldfarb, Liebau, and M. Lisman, and Barington, whose interests are represented by director
Mitarontonda, used their influence over the Company and the Board to push for an all-cash
transaction – the Proposed Transaction – that would lead to a liquidity event, allowing them to
cash out their investments in Pep Boys and reinvest in other areas.  Unlike the Company and its
unaffiliated shareholders, these private equity firms seek a liquidity event and preferred a cash
transaction over a stock-for-stock merger, notwithstanding that a stock-for-stock transaction may
be a superior transaction.

17

72.     Urged by GAMCO and Barinton, the Board agreed to the all-cash offer from Bridgestone despite having received a competing stock-for-stock offer from Party A. Notably, Party A's stock-for-stock offer, which included a collar provision to protect Pep Boys against downward fluctuations of its stock, appear to be more favorable than the Proposed Transaction. For example, in contrast to the Proposed Transaction with Bridgestone, Party A's proposal: (i) provided a higher per share value and allows shareholders to benefit from the combined company's future growth and any synergies created by that merger; (ii) may be structured to receive favorable tax treatment; (iii) obligated the Company to pay a significantly lower termination fee of $10 million to Party A in the event that the Company's shareholder approval was not obtained; (iv) obligated the Company to pay a significantly lower termination fee equal to 3.5% of the Company's equity value in other circumstances (as opposed to 4.2% under the terms of the Proposed Transaction with Bridgestone), including in order to accept a competing offer, and (v) obligated Party A to pay Pep Boys a reverse termination fee of $20 million in the event that Party A did not obtain shareholder approval.

73.     Moreover, in addition to monetizing their beneficial holdings of Pep Boys stock, all officers and directors of the Company stand to receive lucrative payouts upon the consummation of the Proposed Transaction as the result of the acceleration of their unvested stock options, restricted stock units ("RSUs"), and restricted stock units that vest based on the satisfaction of performance goals ("PSUs"). Under the terms of the Merger Agreement, all unvested stock options will become fully vested and exercisable and will be cancelled and converted into a right to receive cash equal to the product of $15 less the exercise price of each option and the number of shares subject to each option. Similarly, all vested and unvested RSUs

18

and PSUs will vest and will be cancelled and converted into a right to receive cash equal to the product of $15 and the number of units covered by an award.

74.    As reflected in the chart below, the Company's directors and officers expect to receive millions in dollars as a result of the consummation of the Proposed Transaction and the acceleration of their unvested equity awards:

| Name | Aggregate Number of Shares Underlying Company Options, Company RSUs and Company PSUs | Aggregate Consideration Payable in Respect of Company Options, Company RSUs and Company PSUs |
|---|---|---|
| Robert H. Hotz | 70,240 | $834,815 |
| Scott P. Sider | 142,477 | $1,042,008 |
| Matthew Goldfarb | 6,530 | $97,950 |
| F. Jack Liebau, Jr. | 6,530 | $97,950 |
| Bruce M. Lisman | 6,530 | $97,950 |
| James A. Mitarotonda | 67,593 | $795,110 |
| Robert L. Nardelli | 8,978 | $134,670 |
| Robert Rosenblatt | 21,437 | $321,555 |
| Jane Scaccetti | 67,071 | $787,280 |
| John T. Sweetwood | 67,071 | $787,280 |
| Andrea M. Weiss | 21,437 | $321,555 |
| David R. Stern | 189,680 | $1,744,158 |
| Christopher J. Adams | 136,363 | $1,288,016 |
| Thomas J. Carey | 136,420 | $1,276,355 |
| Joseph A. Cirelli | 161,086 | $1,358,062 |
| James F. Flanagan | 111,304 | $1,087,123 |
| John J. Kelly | 129,030 | $1,233,545 |
| Brian D. Zuckerman | 191,000 | $1,683,957 |
| Rodney Schriver | 17,435 | $127,592 |
| **All Directors and Executives** | **1,558,212** | **$15,116,931** |

75.    Furthermore, as the chart below reflects, the executive officers stand to receive a windfall in "golden parachute" benefits if their employment are terminated without cause following consummation of the Proposed Transaction:

| Name | Annual Base Salary and Target Bonus | Pro Rata Portion of Bonus | Value of Benefits | Total |
|---|---|---|---|---|
| Scott P. Sider | $1,600,000 | 330,959 | $66,350 | $1,997,309 |

| | | | |
|---|---|---|---|
| David R. Stern | $1,477,840 | 247,271 | $39,258 | $1,764,369 |
| Christopher J. Adams | $1,030,225 | 124,824 | $53,346 | $1,208,395 |
| Thomas J. Carey | $1,056,006 | 127,948 | $38,438 | $1,222,392 |
| Joseph A. Cirelli | $975,623 | 118,208 | $16,260 | $1,110,091 |
| James F. Flanagan | $961,350 | 116,479 | $47,954 | $1,125,783 |
| John J. Kelly | $1,131,000 | 137,034 | $57,718 | $1,325,752 |
| Brian D. Zuckerman | $1,049,307 | 127,136 | $46,814 | $1,223,257 |
| Rodney Schriver[1] | | | | $250,000 |
| **Total** | | | | **$11,227,348** |

76.     Furthermore, upon consummation of the Proposed Transaction, the Company will terminate and liquidate its Nonqualified Plans for all participants, entitling each executive participant to become fully vested and receive a total of $896,369.

77.     Thus, while the Proposed Transaction is not in the best interest of Pep Boys or its stockholders, it will produce lucrative benefits for GAMCO, Barington, and the Company's officers and directors.

**The Unduly Restrictive Deal Protection Devices**

78.     Despite having received competing offers from Party A, and expressions of intersts and proposals from a number of other parties, the Board breached its fiduciary duty by erecting coercive and preclusive structural impediments that are likely to seriously impair the Company's ability to receive competing offers.

79.     The 14D-9 indicates that at least 9 potential bidders (excluding Bridgestone) have entered into NDA and standstill agreements with Pep Boys, including Party A.  These NDA counterparties may be contractually prohibited from making a topping offer for the Company.

80.     Compounding the problem is the fact that the "No Solicitation" provision of the Merger Agreement.  Specifically, § 8.3(a) of the Merger Agreement prevents Pep Boys from

---

[1] Mr. Schriver does not Change of Control Agreement but is entitled to $250,000 under his Non-Competition Agreement if he is terminated without cause.

initiating contact with any potential acquirers, including the NDA and standstill counterparties for the purpose of waiving the existing standstill provisions, and instead requires the Company to terminate any and all prior or on-going discussions and negotiations. While the "No Solicitation" provision permits the Company to waive its rights under these NDA and standstill agreements in order to enable the counterparty to make a competing bid, it may only do so "if requested by the applicable counterparty." This limited exception would not enable the Company to waive standstill provisions that contractually prohibit counterparties from contacting Pep Boys in order to request such a waiver.

81.     In addition, pursuant to § 8.3(b) and (c) of the Merger Agreement, should the Company receive an unsolicited offer, the Company is required to notify Bridgestone of the competing offer within 24 hours. Thereafter, should the Board determine that the unsolicited offer is superior, the Company must first notify Bridgestone of the identity of the competing bidder, the material terms and conditions of the competing bid, and the proposed merger agreement, and then grant Bridgestone at least three (3) business days to amend the terms of the Merger Agreement to make a counter-offer. In other words, the Merger Agreement gives Bridgestone access to any rival bidder's information and Bridgestone a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse because the Merger Agreement unfairly assures that any "auction" would favor Realogy and allow it to piggy-back upon the due diligence of the foreclosed second bidder.

82.     Making matters worse, despite receiving a number of offers and expressions of interest, including the competitive stock-for-stock offer from Company A, the Board agreed to pay Bridgestone an exorbitant termination fee. Section 10.4(b) of the Merger Agreement requires the Company to pay Bridgestone a termination fee of $35 million, amounting to 4.2% of the total

equity value of the Proposed Transaction in various circumstances, including in order for the Company to accept a competing bid, as well as if Company shareholders determine not to approve the Proposed Transaction.    Noticeably absent is a reverse termination clause obligating Bridgestone to pay Pep Boys a fee in the event that Bridgestone breaches the Merger Agreement or if regulatory approval is not obtained.  This termination fee would require any competing bidder to agree to pay a premium of approximately $0.65 per share simply for the right to provide Pep Boys shareholders a superior offer.

83.    The Merger Agreement also provides Bridgestone with a "Top-Up" option which enables Bridgestone to gain the shares necessary to effectuate a short-form merger. Pursuant to § 1.4 of the Merger Agreement, Bridgestone has the option to purchase additional shares from the Company in order to reach the 80% threshold required to effectuate a short-form merger.

84.    Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with third parties regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

**The Materially False and Misleading Recommendation Statement**

85.    On November 16, 2015, the Company filed its Recommendation Statement with the SEC and disseminated it to the Company's public stockholders in an attempt to convince stockholders to tender their shares in the Offer. The Recommendation Statement fails to provide the Company's stockholders with material information and/or provides them with materially

22

misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

86.     Without such information, Pep Boys' shareholders will be forced to decide whether to tender their shares in the Offer and whether to exercise their dissenters' rights under Subchapter D of Chapter 15 of the Pennsylvania Entity Transactions Law without all information necessary to make a fully informed decision

***Materially Incomplete and Misleading Statements Regarding the Flawed Sales Process***

87.     Defendants fail to disclose material information relating to the process leading up to the Proposed Transaction.

88.     While the Recommendation Statement indicates that the Company has entered into the NDA or standstill agreements with at least 9 potential bidders (excluding Bridgestone), Defendants fail to disclose whether any of those agreements contractually prohibit the counterparty from making an offer to the Company and if so, whether the counterparty contractually prohibited from contact the Company in order to request a waiver of the standstill provision. Related to this, while the Recommendation Statement clearly indicates that the Company entered into a NDA and standstill agreement with Bridgestone, Defendants failed to file a copy of this material agreement with the SEC.

89.     The Recommendation Statement provides materially incomplete and misleading information relating to Party A's stock-for-stock offer, which the Board had rejected in favor of all-cash transaction with Bridgestone. For example, the Recommendation Statement misleadingly states that in electing to pursue the Proposed Transaction over a stock-for-stock transaction with Party A, the Board considered the lack of certainty of the value of the non-cash consideration "due to the potential volatility of stock prices and markets . . ." Yet, the Recommendation Statement also indicated that Party A agreed to revise its original fixed exchange ratio offer into a fixed value

structure, subject to a collar provision, which implies that Pep Boys and its shareholders would be protected from downward fluctuations in Party A's stock. In assessing the Proposed Transaction is in their best interest, Pep Boys shareholders require information concerning the precise protection against such fluctuation provided by the fixed value structure and collar provision proposed by Party A, as well as information relating to the liquidity of Party A's stock, such as Party A's market capitalization, average trading volume, and public float.

90.     The Recommendation Statement is also materially incomplete and misleadingly concerning the factors considered by the Board in determining to reject Party A's offer in favor of the Proposed Transaction. For example, the Recommendation Statement fails to state whether the Board considered the tax consequences of the Proposed Transaction and Party A's proposal to shareholders, and whether a transaction with Party A could or would be structured as a tax-free transaction.

91.     The Recommendation Statement indicates that the feasibility study commissioned by the Company in 2013-2014 reflected that a sale of the Company's retail business could be financially viable from both the Company's and a potential purchaser's perspective, and that Party B, among others, was interested in acquiring this retail business. Yet, the Recommendation Statement fails to provide a fair summary of the status of negotiations with Party B at the time that the Board determined to approve the Proposed Transaction with Bridgestone.

92.     The Recommendation Statement fails to provide a fair summary of the dates and discussions, if any, between Pep Boys and Bridgestone, and/or their respective representatives, regarding potential post-merger employment, consulting, and directorship opportunities for Pep Boys' officers and/or directors, including whether any or all of Pep Boys' officers have reasonable expectations that they will retain their employment at the combined company.

24

***Materially Incomplete and Misleading Statements Regarding***
***the Management-Prepared Financial Forecasts***

93.     The Recommendation Statement discloses a materially incomplete and misleading

set of the management-prepared financial projections for the Company that had been provided to

and considered by both the Board in approving the Proposed Transaction and Rothschild in

preparing its fairness opinion.  For example, the Recommendation Statement omits following

material projections:

(a)     reconciliation of GAAP net income to non-GAAP unlevered free cash flow

and non-GAAP EBITDA;

(b)     depreciation and amortization;

(c)     stock-based compensation expense;

(d)     taxes or tax rate; and

(e)     changes in net working capital.

94.     The Recommendation Statement indicates that:  (i) the feasibility study

commissioned by the Company reflected that a sale of the Company's retail business could be

financially viable from both the Company's and a potential purchaser's perspective, (ii) Party B,

among others, was interested in acquiring this retail business and continued to negotiate with

Bridgestone concerning such an acquisition until the time that the Board approved the Proposed

Transaction, and (iii) Rothschild performed an "Illustrative Valuation of Sale and Separation of

Retail Business," which reflected that the implied per share equity reference high for Pep Boys as

$16.50. Yet, Defendants fail to disclose any "sum of the parts" projections of the Company's retail

and service business segments.     The sum-of-the parts projections of the Company's retail and

services businesses, which are material to a Company's shareholder's ability to weigh the

25

Proposed Transaction against other potential transactions, including a potential transaction with Party B.

***Materially Incomplete and Misleading Disclosures Concerning Rothschild's Financial Analyses and Potential Conflict of Interests***

95.     The Recommendation Statement discloses certain information regarding Rothschild's financial analyses used to support its fairness opinion. These disclosures concerning Rothschild's financial analyses are materially incomplete and misleading in a number of respects.

96.     The Registration Statement fails to disclose what adjustments to enterprise value with regard to net debt, minimum operating cash, non-operating assets, and non-operating liabilities were used to arrive at equity value. This information is material to the Company shareholders.

97.     The Recommendation Statement fails to disclose material information relating to the Rothschild's Selected Public Companies Analysis, including:

(a)     The objective criteria utilized by Rothschild in its selection of companies for the two sectors used in this analysis, particularly given that a number of the public companies identified by Pep Boys as being its peers in the Recommendation Statement – e.g., Finish Line, Rent-a-Center, Lithia Motors, Midas, Aaron's, hhgregg, Pier 1, Radioshack, and Williams Sonoma – were not included in this Analysis;

(b)     In its calculation of the implied per share equity reference range for the Company, the basis for Rothschild's decision to apply a reference range of EV/EBITDA multiples of 7.0x to 9.0x, when the median and mean of the Core Automotive Aftermarket and all selected public companies were entirely above this reference range, particularly given that the selected range was also utilized in Rothschild's Illustrative Discounted Cash Flow ("DCF") Analysis;

(c)     The benchmarking metrics for each of the selected companies analyzed;

(d)     Quantification and explanation of the basis for estimating minimum operating cash, non-operating assets, non-operating liabilities; and

(e)     The multiples observed for each of the selected companies and specification as to whether any company's multiples were excluded as "not meaningful" or "not publicly available."

98.     The Recommendation Statement fails to disclose material information relating to the Rothschild's Selected Precedent Transactions Analysis, including:

(a)     The objective criteria utilized by Rothschild in its selection of transactions for the three sectors used in this analysis;

(b)     In its calculation of the implied per share equity reference range for the Company, the basis for Rothschild's decision to apply a range of EV/LTM EBITDA multiples of 8.5x to 11.5x when the medians for the Automotive Service, Automotive Aftermarket Retail, and all selected transactions were entirely above this reference range, and the median for the Tires transactions was only slightly below the high of this reference range; and

(c)     The multiples and target enterprise values observed for each of the selected transaction and specification as to whether any transaction's multiples were excluded as "not meaningful" or "not publicly available," particularly in light of the wide range of observed minimum and maximum multiples and the omission of the means.

99.     The Recommendation Statement fails to disclose material information relating to the Rothschild's Illustrative DCF Analysis, including:

(a)     the basis for the discount rate range of 8.5% to 10.5%;

27

(b)     The implied terminal EBITDA multiples derived from the selected perpetuity growth rate range of 2.5% - 3.5%;

(c)     The implied terminal perpetuity growth rates derived from the selected terminal forward EBITDA multiples of 7.0x – 9.0x;

(d)     The terminal EBITDA on which Rothschild's analysis relied;

(e)     The definition of unlevered free cash flows, including whether stock-based compensation expense was treated as a cash or non-cash expense; and

(f)     quantification of the weighted average cost of capital ("WACC") assumptions.

100.    The Recommendation Statement fails to disclose material information relating to the Rothschild's Illustrative Valuation of Sale and Separation of Retail Business Analysis, including:

(a)     In estimating the value range of the Company's automotive service business as $690 to $860 million, the basis for Rothschild's selection of EV/EBITDA multiple range of 8.0x to 10.0x, which is entirely below the mean and median multiples of EV/FY2016E EBITDA derived for the Core Automotive Aftermarket companies selected in the Selected Public Companies Analysis and the median EV/LTM EBITDA multiple derived for the Automotive Service transactions;

(b)     The basis for management's estimation of the value of the Company's retail business, net of costs and taxes, as $175 million, including whether Rothschild made any adjustments to the estimate and the terms provided by management to Rothschild to value the sale and separation of the retail business, including: (i) number of retail locations incuded in the sale; (ii) square footage to be leased by the buyer from the Company;

28

(iii) rent which would be paid per square foot for such locations; (iv) terms and conditions of a supply agreement.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

101.    Each of the Individual Defendants owed to Pep Boys and its shareholders the duties of loyalty, good faith, due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, along with the duty of full and candid disclosure of all material facts related thereto.    Furthermore, the Individual Defendants owed a duty to Pep Boys to ensure that Pep Boys operated in compliance with all applicable federal and state laws, rules, and regulations, and that Pep Boys did not engage in any unsafe, unsound, or illegal business practices.

102.    To discharge these duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Pep Boys.    By virtue of their obligations to carry out their duties with the utmost loyalty, good faith, due care and diligence, the Individual Defendants were required, among other things, to:

(a)    manage, conduct, supervise, and direct the employees, businesses and affairs of the Company in accordance with all applicable laws, rules and regulations, and the Company's charter and by-laws;

(b)    neither violate nor knowingly, recklessly or negligently permit any officer, director or employee of the Company to violate applicable laws, rules and regulations and to exercise reasonable control and supervision over such officers and employees;

(c)    ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by the Company;

29

(d)     remain informed as to how the Company, in fact, was operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice;

(e)     supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by the Company and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of the Company and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth herein; and

(f)     preserve and enhance the Company's reputation as a public corporation and to maintain public trust and confidence in the Company as a prudently managed institution fully capable of meeting its duties and obligations.

103.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith and independence owed to Pep Boys and IMS and DC Capital are aiding and abetting the Board's breaches.

## CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this action on its own behalf and as a class action on behalf of all owners of Pep Boys common stock and their successors in interest, except Defendants and their affiliates (the "Class").

105.    This action is properly maintainable as a class action for the following reasons:

(a)     the Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, as of October 21, 2015, 54,023,768 shares of common stock were represented by the Company as outstanding.

(b)     questions of law and fact are common to the Class, including, inter alia, the following:

(i)     Have the Defendants breached their fiduciary duties of undivided loyalty, independence, or due care with respect to Plaintiff, the Company, and the other members of the Class in connection with the Proposed Transaction;

(ii)    Have the Defendants breached any of their other fiduciary duties to plaintiffs, the Company, and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

(iii)   Have the Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

(iv)    Have the Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(v)     Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

      (vi)     Have Pep Boys, Bridgestone Retail, Bridgestone Americas, and TAJ aided and abetted the Individual Defendants' breaches of fiduciary duty; and

      (vii)    Is the Class entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action, are adequate representatives of the Class, and have retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## DERIVATIVE ALLEGATIONS AND
## DEMAND PURSUANT TO PENNSYLVANIA LAW

106.    Plaintiffs also bring this action derivatively in the right and for the benefit of Pep Boys to redress injuries suffered, and to be suffered, by Pep Boys as a direct result of breaches of

fiduciary duty by the Individual Defendants. As to the derivative claims, Pep Boys is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

107. Pursuant to Pennsylvania law, in a letter dated November 5, 2015, Plaintiff made a demand upon the current Pep Boys' Board as required, describing (i) the factual basis for the allegations of wrongdoing, (ii) how such wrongdoing is harmful to the Company, and (iii) requesting that the Board take remedial action, including without limitation, ensuring that the Proposed Transaction's consideration is fair to Pep Boys and its shareholders.

108. In addition, pursuant to Commonwealth law, demand is excused because such a demand would be a futile and useless act that would lead to Pep Boys suffering irreparable injury, particularly for the following reasons:

(a) Each of the Individual Defendants knew of and/or directly benefited from the wrongdoing complained of herein;

(b) Each member of the Board has been named as a defendant to this lawsuit;

(c) In order to bring this suit, all of the directors of Pep Boys would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(d) The acts complained of constitute violations of the fiduciary duties owed by Pep Boys' officers and directors and these acts are incapable of ratification;

(e) Any suit by the directors of Pep Boys to remedy these wrongs would likely expose the Individual Defendants and Pep Boys to further civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(f)     Each member of the Pep Boys Board is, directly or indirectly, the recipient of remuneration paid by the Company, by virtue of their Board membership, the continuation of which is dependent upon their cooperation with the other members of the Board, and their participation and acquiescence in the wrongdoing set forth herein, and is therefore incapable of exercising independent objective judgment in deciding whether to bring this action; and

(g)     Because of their association as directors of the Company, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment.

109.    The Company's directors and executive officers have material conflicts of interest and are acting to better their own personal interests through the Proposed Transaction at the expense of Pep Boys' public shareholders.

110.    As indicated, *supra*, Defendants Goldfarb, Liebau, and Lisman were handpicked by and represent the interests of activist shareholder GAMCO; and as Barington's co-founder, President, and CEO, Defendant Mitarotonda represents the interests of this activist shareholder. Unlike Plaintiff and the Company's unaffiliated shareholders, GAMCO and Barington sought and prioritized a liquidity event for the Company.

111.    In addition, all unvested stock options, RSUs, and held by the Company's directors will automatically vest upon consummation of the Proposed Transaction and entitle the directors to cash payouts.

112.    For the reasons detailed herein, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

34

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(e) of the Exchange Act
### Against All Defendants

113.    Plaintiff repeats all previous allegations as if set forth in full herein.

114.    Plaintiff brings this cause of action in his individual capacity.

115.    Defendants violated Section 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the Offer commenced in conjunction with the Proposed Transaction.

116.    Defendants knew that Plaintiffs would rely upon their statements in the Recommendation Statement in determining whether to tender their shares pursuant to the Offer commenced in conjunction with the Proposed Transaction.

117.    As a direct and proximate result of these Defendants' unlawful course of conduct in violation of Section 14(e) of the Exchange Act, absent injunctive relief from the Court, Plaintiff has sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision in deciding whether or not to tender their shares.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against All Individual Defendants

118.    Plaintiff repeats all previous allegations as if set forth in full herein.

119.    Plaintiff brings this cause of action in his individual capacity.

120.    The Individual Defendants acted as controlling persons of Pep Boys within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Pep Boys and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading

121.    The Registration Statement violates Section 14(e) because it omits material facts, including those set forth above. In the exercise of reasonable care, Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

122.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff, as well as the Company's other public shareholders, and Plaintiff and other shareholders will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT III
### For Breach of Fiduciary Duties Against the Individual Defendants
### (Brought Derivatively on Behalf of Pep Boys)

123.    Plaintiff repeats all previous allegations as if set forth in full herein.

124.    The Individual Defendants have violated the fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of Pep Boys and have acted to put their personal interests ahead of the interests of Pep Boys' shareholders.

125.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value inherent in and arising from Pep Boys.

126.    The Individual Defendants have violated their fiduciary duties by entering Pep Boys into the Merger Agreement without regard to the effect of the Proposed Transaction on Pep Boys' shareholders.

127.    Specifically, the fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting Pep Boys shareholders.

128.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Pep Boys, Plaintiff and the other members of the Class. As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and omissions of material information.

129.    As a result of the Individual Defendants' unlawful actions, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Pep Boys' assets and operations. Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Proposed Transaction terms and may consummate the Proposed Transaction, all to the irreparable harm of the members of the Class.

130.    Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

### COUNT IV
### Aiding and Abetting
### Against Bridgestone Retail, Bridgestone Americas, and TAJ
### (Brought Derivatively on Behalf of Pep Boys)

131.    Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

132.    As alleged in more detail above, Defendants Bridgestone Retail, Bridgestone Americas, and TAJ have aided and abetted the Individual Defendants' breaches of fiduciary duties.

133.    As a result, Plaintiff and the Class are being harmed.

134.    Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)    declaring this action to be a properly maintainable class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)    declaring that the Recommendation Statement is materially misleading and contains omissions of material fact in violation of Section 14(e) and 20(a) of the Exchange Act;

(C)    enjoining, preliminarily and permanently, the Merger Agreement and the Proposed Transaction unless or until the Company adopts and implements a procedure or process to: (i) obtain the highest possible value in the best interests of Plaintiff and other Pep Boys shareholders, and (ii) provide all material disclosures to Plaintiff and all Pep Boys shareholders with which they are able to make informed decisions about whether to vote their shares in favor of the proposed sale of Pep Boys to Bridgestone;

        (D)     in the event that the Proposed Transaction is consummated prior to the entry

of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

        (E)     awarding Plaintiff the costs of this action, including a reasonable allowance

for the fees and expenses of Plaintiff's attorneys and experts; and

        (F)     granting Plaintiff and the other members of the Class such further equitable

relief as the Court deems just and proper.

## JURY DEMAND

        Plaintiff demands a trial by jury.

Dated: November 24, 2015

                               BRODSKY & SMITH, LLC

                               By: _____

                               Evan J. Smith, Esquire
                               Two Bala Plaza, Suite 510
                               Bala Cynwyd, PA 19004
                               610-667-6200
                               610-667-9029 (facsimile)

                               LEVI & KORSINSKY, LLP
                               Julia Sun, Esq.
                               30 Broad Street, 24th Floor
                               New York, New York 10004
                               Tel: (212) 363-7500
                               Fax: (212) 363-7171

                               *Attorneys for Plaintiff*